UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GOM OPERATING LLC, ARRAY PETROLEUM, LLC, AND NATURAL RESOURCES WORLDWIDE LLC<br><br>VERSUS<br><br>GULF OFFSHORE LOGISTICS, L.L.C., RONALD E. CHADDOCK, JAMES M. ZOTKIEWICZ AND JOHN S. RUSSELL | CIVIL ACTION: 25-cv-362<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL VERIFIED COMPLAINT

Plaintiffs GOM Operating LLC, Array Petroleum, LLC, and Natural Resources Worldwide LLC (collectively, the "Plaintiffs"), by and through their undersigned attorneys, as and for their complaint against Defendants Gulf Offshore Logistics, L.L.C., Ronald E. Chaddock, James M. Zotkiewicz, and John S. Russell (collectively, the "Defendants"), allege as follows:

### NATURE OF ACTION

1. This is an action seeking injunctive relief and damages arising from Defendants' breach of contract, breach of fiduciary duty, fraud, conversion, and unfair trade practices in violation of the Louisiana Unfair Trade Practices Act.

### THE PARTIES

2. Plaintiff GOM Operating LLC ("GOM") is a Delaware limited liability company residing in and having a principal place of business in Dallas, Texas. The sole authorized person for GOM is John Chambers, a resident of Texas.

3. Plaintiff Array Petroleum, LLC ("Array") is a Louisiana limited liability company residing in and having a principal place of business in Dallas, Texas. Its sole member is GOM.

1202125v1

4. Plaintiff Natural Resources Worldwide LLC ("NRW") is a Delaware limited liability company residing in and having a principal place of business in Dallas, Texas. NRW is owned by the 2023 Delaware Asset Protection Trust, the trustee of which is the Arden Trust Company ("Arden"). Arden is chartered in Delaware with certificates of authority to do business in Arizona, California, Delaware, Florida, Illinois, Ohio, Oregon, Pennsylvania and Texas.

5. Defendant Gulf Offshore Logistics, L.L.C. ("GOL") is a Louisiana limited liability company residing in and having a principal place of business in or near Raceland, Louisiana.

6. Defendant Ronald E. Chaddock ("Chaddock") is an individual residing in Louisiana and Alabama. He is (or, at a minimum, was at all relevant times) the President and an owner of GOL. Prior to its sale to GOM, Chaddock was also the majority owner of Array and its Chief Executive Officer.

7. Defendant James M. Zotkiewicz ("Zotkiewicz") is an individual residing in Metairie, Louisiana. Prior to its sale to GOM, Zotkiewicz was a minority owner and Executive Vice President of Geology of Array.

8. Defendant John S. Russell ("Russell") is an individual residing in Metairie, Louisiana and Alabama. Prior to its sale to GOM, Russell was a minority owner and Executive Vice President of Operations of Array.

**JURISDICTION AND VENUE**

9. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 43 U.S.C. § 1349(b)(1) of the Outer Continental Shelf Lands Act because this case and controversy is in connection with operations conducted on the Outer Continental Shelf for the development or production of minerals of the Outer Continental Shelf.

10. In addition, the Court has jurisdiction under 28 U.S.C. § 1332 owing to the diversity of the parties.

11. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

12. Venue is proper pursuant to 43 U.S.C. § 1349(b)(1) of the Outer Continental Shelf Lands Act because this judicial district is nearest to the place where the cause of action arose. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1) and 43 U.S.C. § 1349(b)(1) insofar as Defendants Chaddock and Zotkiewicz reside in this judicial district. Moreover, the relevant instruments between the parties designate this judicial district as a proper venue.

## GENERAL ALLEGATIONS

### NRW and Array's Operations

13. NRW owns wells, platforms and associated facilities in federal blocks on the Outer Continental Shelf off the coast of Louisiana in the Gulf of America for oil and gas production (the "Properties"). NRW acquired the Properties by purchasing them in the bankruptcy proceedings of Cox Oil Offshore, L.L.C., Energy XII GOM, LLC, EPL Oil & Gas, LLC, MLCJR LLC, Cox Operating L.L.C., and Energy XXI Gulf Coast, LLC (collectively, "Cox"). NRW entered into a Purchase and Sale Agreement with the Debtors in the Cox bankruptcy proceedings dated January 11, 2024. That agreement was approved by the bankruptcy court on February 10, 2024.

14. Array agreed to provide certain services to NRW in connection with the operation of the Properties through an Offshore Contract Operating Agreement dated February 1, 2024 (the "Operating Agreement"). To that end, Array obtained approval from the US Department of the Interior's Bureau of Ocean Energy Management to act as the federally recognized operator of the Properties.

### Chaddock's Self-Dealing Brings Exorbitant Costs to Array

15. Chaddock held a unique position in the operation of the Properties. On the one hand, he was the majority owner and Chief Executive Officer of Array, the federally-approved

operator. On the other hand, he was an owner and the president of GOL, which was the exclusive provider of vessel services to Array's operations of the Properties and Array's single largest contractor for these operations.

16. In light of this position of occupying both sides of the ledger, Chaddock stood to profit by engaging in self-dealing. Specifically, Chaddock could cause GOL to charge extraordinarily high rates to Array for vessel services to the Properties. This would serve to enrich Chaddock provided Array then received payment for these inflated costs by passing them on to NRW.

17. Chaddock put this scheme work. First, he caused GOL to dedicate a substantial fleet of vessels to the Properties that vastly outstripped their needs.

18. Indeed, several of Properties were shut-in or otherwise not operating, which thereby obviated the need for having vessels dedicated to them. Yet, Chaddock had GOL provide these unneeded vessels to the Properties anyway.

19. Second, Chaddock had GOL inflate the rates of those vessels. Within the oil and gas industry, it is customary for vessels to be charged according to two classes of rates: (1) on active status when a vessel is engaged in rendering actual services to an asset, and (2) on downtime status when the vessel is sitting idle. Chaddock had GOL charge the vessels services to Array on an active status full time irrespective of when the vessels were idle.

20. To do all this, Chaddock either ignored or directly controverted industry standards and the operational requirements of both Array and GOL. Upon information and belief, GOL had no contract with Array unlike the other vendors that provided services to the Properties. Further, Chaddock caused GOL to charge rates and amounts to Array that vastly exceeded industry standards and the Operating Agreement.

21. In doing so, Chaddock was violating the requirements of the Operating Agreement, which mandated that the services performed for the benefit of the Properties be rendered in conformance with industry standards.

22. In taking these steps, Chaddock violated the fiduciary duties that he owed to Array.

23. Moreover, Chaddock imperiled the financial condition of Array.

24. By enriching himself, Chaddock put in jeopardy four companies: GOM, NRW, Array and GOL (in which Chaddock's partners were likely unaware of his misconduct during the relevant time period).

**Seeking to Eliminate the Mismanagement, GOM Agrees to Acquire Array**

25. Ultimately, NRW was dependent on Array as the federally approved operator of the Properties. For that reason, GOM, with whom NRW shares common management, agreed to acquire Array to maintain it as a going concern while eliminating Chaddock's mismanagement.

26. The transaction for GOM's acquisition of Array consisted of several interlinking parts. One of these was the Membership Interest Purchase Agreement dated December 31, 2024 (the "MIPA"),[1] by which GOM acquired the ownership interests of Chaddock (62%), Zotkiewicz (19%), and Russell (19%) (collectively, the "Sellers") in Array in exchange for a purchase price.

27. The transaction also included two promissory notes that augmented the purchase price. The first was in favor of Chaddock for, as amended, $1,132,333.00 (the "Chaddock Promissory Note") with an accompanying mortgage.[2]

---

[1]  A true and correct copy of the MIPA is attached hereto as Exhibit 1.

[2]  A true and correct copy of the Chaddock Promissory Note and accompanying mortgage are attached hereto as Exhibit 2.

28. The second was in favor of GOL in the amount of $2,862,581.40 (the "GOL Promissory Note") with an accompanying mortgage.[3] The GOL Promissory Note novates and replaces the invoices between GOL and Array with a new obligation between GOL and NRW.

29. Through this transaction, the Sellers attested to several representations and warranties in the MIPA that assured GOM, as acquirer, of the overall fitness of Array.

30. For instance, the Sellers represented and warranted that Array was in full legal compliance. Section 4(i) of the MIPA states: "The Company has complied, and is now complying, with all laws applicable to it or its business, properties or assets. . . . No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any license or permit required for the conduct of the Business."[4]

31. The Sellers represented and warranted that there were no material liabilities. Section 4(e) of the MIPA states: "The Company has no . . . liabilities of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured except (i) those which are adequately reflected in the Tax Returns, and (ii) those which have been incurred in the ordinary course of business consistent with past practice since the date of the 2023 Tax Return and which are not, individually or in the aggregate, material in amount."[5]

32. The Sellers represented and warranted that there were no claims against Array. Section 4(h) of the MIPA states: "There is no [claim, action, suit, proceeding or governmental

---

[3] A true and correct copy of the GOL Promissory Note and accompanying mortgage are attached hereto as Exhibit 3.

[4] Ex. 1 (MIPA) at § 4(i).

[5] *Id.* at § 4(e).

investigation] of any nature pending or, to the Company or any Seller's knowledge, threatened against . . . the Company, its activities, properties or assets . . . . No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action."[6]

33. Finally, the Sellers covenanted that these representations and warranties were all accurate. Section 4(w) of the MIPA states: "None of the representations and warranties made by Sellers in this Agreement, any schedule or exhibit hereto, or in any letter, certificate, exhibit, schedule or memorandum furnished to Buyer in connection with this Agreement, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact the omission of which would make the statements made therein misleading in any material respect."[7]

### The Sellers Breach the Sale Agreement by Failing to Disclose Numerous Material Liabilities

34. Since the closing of the transaction, it has become clear that the Sellers have breached the MIPA in multiple material ways.

35. As discussed above, Sellers represented and warranted in the MIPA that there were no liabilities of any nature whatsoever that are either material in amount or not already set forth in the Tax Returns, which only reflect $22,196 in legal/professional and office expenses.

36. Contrary to this contractual covenant, GOM and NRW have learned of millions of dollars in liabilities of Array that were not disclosed as part of the Section 4(e) of the MIPA. In fact, GOM and NRW are still unsure if they have a complete picture of Array's outstanding obligations because they continue to uncover previously undisclosed material liabilities of Array.

37. For example, as part of an arduous forensic accounting process, GOM and NRW have discovered more than $9 million in invoices that were owing by the date of the transaction's

---

[6] *Id.* at § 4(h).

[7] *Id.* at § 4(w).

closing on December 31, 2024, but had not been coded and entered into Array's accounting system. In addition to obscuring the true financial condition of Array, this caused the Lease Operating System reports to misstate the operating performance of the NRW properties. Well expenses that otherwise would be reimbursed by outside partners could not be billed.

38. Likewise, Sellers represented and warranted that Array was in full legal compliance as of the close of the transaction pursuant to Section 4(e) of the MIPA.

39. Now, however, GOM and NRW have become aware of dozens of Incidents of Noncompliance ("INCs") issued to Array related to the Properties. Such INCs are typically issued by the US Department of the Interior's Bureau of Safety and Environmental Enforcement ("BSEE") when it determines an operator has violated BSEE's regulations in its oil and gas operations. Accordingly, GOM and NRW are now forced to shoulder the expense of remedying the underlying issues that formed the basis of the INCs and obtaining BSEE's approval of those remedies.

40. Similarly, under Section 4(h) of the MIPA, Sellers represented and warranted that there were no claims against Array. Sellers have breached this provision as well. Since the closing, GOM and NRW have discovered more than $6 million in liens filed against Array relating to the Properties.

41. All these breaches by the Sellers have undermined the value of the assets that GOM acquired: Array. As such, NRW should not be required to overpay by performing under the original terms of the GOL Promissory Note and the Chaddock Promissory Note.

42. To be clear, neither GOM nor NRW are looking to rescind the transaction. Instead, GOM and NRW come to this Court to seek remedy for the Sellers' breaches.

## The Sellers Commit Fraud

43. In pursuing the transaction, the Sellers attempted to leverage Array's position as the federally approved operator of the Properties.

44. Seeking to increase that leverage, the Sellers also flaunted their control of the Properties by threatening to shut in the wells, knowing that NRW was dependent on the Properties' production as its sole source of revenue.

45. On December 21, 2024, NRW issued a payment, in an agreement with Array while it was still owned by the Sellers, of $2.1 million to prevent the Sellers from shutting in the Properties. In addition, NRW paid for $300,000 in fuel for the benefit for GOL that was never reimbursed after the Sellers shut down production, which negated the need for GOL's vessels. Chaddock, on behalf of the Sellers, even confirmed that he understood these funds were to be used to continue production.

46. Then, on December 27, 2024, in the clearest terms possible, counsel for NRW instructed counsel for the Sellers: "THE FIELDS MUST NOT BE SHUT-IN."[8]

47. Even so, the Sellers proceeded with shutting in the Properties in attempt to force NRW and GOM into acquiring Array on the Sellers' expedited terms.

48. Yet, the Sellers expressly claimed the shut-in was merely a temporary measure that would be easily reversed.

49. Specifically, on December 27, 2024, counsel to the Sellers stated in an email to counsel to GOM and NRW: "Please be advised that the fields are shut in in the form of a hurricane evacuation shut in. The fields can be reopened fairly quickly. … Please advise if NRW wishes to

---

[8] A true and correct copy of this correspondence is attached hereto as Exhibit 4.

1202125v1

continue discussions on the [transaction]. Otherwise, please advise if NRW wishes to discontinue negotiations and move to a permanent shut in."[9]

50. In the face of that bald threat, NRW and GOM reasonably and justifiably relied on the Sellers' representation of a hurricane shut-in by continuing to negotiate for the purchase of Array and closing on the transaction four days later.

51. Unbeknownst to NRW or GOM, the Sellers representation was false. Upon information and belief, the Sellers made this misrepresentation with fraudulent intent to cause NRW and GOM to enter into the transaction and pay more than they otherwise would.

52. As NRW and GOM have now found, the Sellers actually caused the Properties to be permanently shut it.

53. The difference between a temporary hurricane shut-in and a permanent shut-in is significant.

54. As the Sellers' own representation states, a temporary hurricane shut-in can be quickly reversed. This involves a minimal amount of effort and cost. A permanent shut-in, by contrast, involves significantly more work, costs and time delays.

55. Due to the Sellers' fraudulent misrepresentation as to the status of the Properties, Plaintiffs have been forced to incur the extraordinary expenses of reversing the permanent shut-in. Additionally, NRW has lost the value of the Properties' production while the wells have been shut in.

56. Had GOM and NRW known that the Sellers' representation as to the shut-in was false, they would not have entered into the transaction in the form that they did. At the very least, they would have required the Sellers to remedy the permanent shut-in of the Properties.

---

[9] *Id.*

**The Sellers Convert Array's Funds**

57. Prior to the close of GOM's acquisition of Array, the Sellers caused Array to issue $300,000 to its attorneys as a retainer for prospective legal services. Those legal services are no longer needed.

58. Upon information and belief, since GOM acquired Array, the Sellers have caused some or all those funds to be sent to them personally. Those funds rightfully belong to Array.

**FIRST CLAIM FOR RELIEF – PLAINTIFFS AGAINST ALL DEFENDANTS**

**Declaratory Judgment**

59. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 58 above as if specifically set forth herein in their entirety.

60. An actual, present, and existing controversy exists between Plaintiffs and Defendants over whether:

>   (1)   GOL is presently entitled to payments under the GOL Promissory Note in light of the breaches to the parties' contracts;
>
>   (2)   GOL is presently entitled to payments under the GOL Promissory Note in light of the Chaddock's fraudulent conduct;
>
>   (3)   GOL is presently entitled to payments under the GOL Promissory Note in light of the unfair trade practices of GOL and Chaddock;
>
>   (4)   The amount owed under the GOL Promissory Note should be reduced according to the losses incurred by GOM and NRW as a result of (a) the breaches to the parties' contracts, (b) Chaddock's fraudulent conduct, and/or (c) the unfair trade practices of GOL and Chaddock;
>
>   (5)   Chaddock is presently entitled to payments under the Chaddock Promissory Note in light of the breaches to the parties' contracts;
>
>   (6)   Chaddock is presently entitled to payments under the Chaddock Promissory Note in light of the Chaddock's fraudulent conduct;
>
>   (7)   Chaddock is presently entitled to payments under the Chaddock Promissory Note in light of the unfair trade practices of GOL and Chaddock;

(8) The amount owed under the Chaddock Promissory Note should be reduced according to the losses incurred by GOM and NRW as a result of (a) the breaches to the parties' contracts, (b) Chaddock's fraudulent conduct, and/or (c) the unfair trade practices of GOL and Chaddock;

(9) The GOL Promissory Note acted as a novation of all outstanding invoices issued by GOL to Array;

(10) As a result of the novation, GOL is not entitled to any relief based on those invoices and GOL's redress is limited to the terms of the GOL Promissory Note; and

(11) Because the MIPA controls the Sellers' available means of relief, as opposed to any work performed in favor of the Properties, the Sellers can only seek relief pursuant to the terms of the MIPA.

61. Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs are entitled to a judgment from this Court recognizing and declaring that:

(1) GOL is not entitled to payments under the GOL Promissory Note due to the breaches to the parties' contracts;

(2) GOL is not entitled to payments under the GOL Promissory Note due to the Chaddock's fraudulent conduct;

(3) GOL is not entitled to payments under the GOL Promissory Note due to the unfair trade practices of GOL and Chaddock;

(4) The amount owed under the GOL Promissory Note should be reduced according to the losses incurred by GOM and NRW as a result of (a) the breaches to the parties' contracts, (b) Chaddock's fraudulent conduct, and/or (c) the unfair trade practices of GOL and Chaddock;

(5) Chaddock is not entitled to payments under the Chaddock Promissory Note due to the breaches to the parties' contracts;

(6) Chaddock is not entitled to payments under the Chaddock Promissory Note due to the Chaddock's fraudulent conduct;

(7) Chaddock is not entitled to payments under the Chaddock Promissory Note due to the unfair trade practices of GOL and Chaddock;

(8) The amount owed under the Chaddock Promissory Note should be reduced according to the losses incurred by GOM and NRW as a

      result of (a) the breaches to the parties' contracts, (b) Chaddock's fraudulent conduct, and/or (c) the unfair trade practices of GOL and Chaddock;

(9)  The GOL Promissory Note acted as a novation of all outstanding invoices issued by GOL to Array;

(10)  As a result of the novation, GOL is not entitled to any relief based on those invoices and GOL's redress is limited to the terms of the GOL Promissory Note; and

(11)  Because the MIPA controls the Sellers' available means of relief, as opposed to any work performed in favor of the Properties, the Sellers can only seek relief pursuant to the terms of the MIPA.

### SECOND CLAIM FOR RELIEF – GOM AGAINST SELLERS

### Breach of Contract

62.  Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 61 above as if specifically set forth herein in their entirety.

63.  GOM and the Sellers entered into a valid and enforceable contract in the form of the MIPA.

64.  The MIPA contained several material representations and warranties made by the Sellers, including Sections 4(i) (full legal compliance by Array), 4(e) (no material liabilities of Array), 4(h) (no claims against Array), and 4(w) (complete accuracy).

65.  The Sellers breached these contractual provisions.

66.  GOM has been injured as a result of these breaches.

67.  GOM is entitled to damages as compensation for the injuries resulting from these breaches.

## **THIRD CLAIM FOR RELIEF – GOM AND NRW AGAINST SELLERS**

### **Fraud**

68. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 67 above as if specifically set forth herein in their entirety.

69. As part of the transaction in selling Array, the Sellers made an intentional misrepresentation of the truth. Specifically, the Sellers stated to GOM and NRW in writing that they were only engaged in a hurricane shut-in of the Properties.

70. This was false. In fact, the Sellers had directed Array's agents to conduct a permanent shut-in of the Properties.

71. This misrepresentation was made with the intent to gain an unjust advantage or to cause damage or inconvenience to GOM and NRW.

72. This misrepresentation substantially influenced GOM and NRW's conduct.

73. Had GOM and NRW known that the Sellers' representation as to the shut-in was false, they would not have entered into the transaction in the form that they did. At the very least, they would have required the Sellers to remedy the permanent shut-in of the Properties.

74. As a result, GOM and NRW have been injured by the Sellers' misrepresentation.

75. GOM and NRW are entitled to damages causally arising from the Sellers' misrepresentation, including but not limited to (1) all the costs being incurred by GOM and NRW to remedy the permanent shut-in of the Properties, (2) all the lost production of the Properties while they are permanently shut-in, and (3) all other losses suffered by GOM and NRW owing to the permanent shut-in of the Properties.

## FOURTH CLAIM FOR RELIEF – ARRAY AGAINST CHADDOCK

### Breach of Fiduciary Duty

76. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 75 above as if specifically set forth herein in their entirety.

77. Chaddock was a member and the Chief Executive Officer of Array.

78. Under Array's Operating Agreement and by operation of Louisiana law, Chaddock owed fiduciary duties to Array. Pursuant to LA. STAT. ANN. § 12:1312, Chaddock is "deemed to stand in a fiduciary relationship to" Array and was required to "discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances."

79. Chaddock's fiduciary duties to Array included the duty of loyalty and the duty of care. *See Patin v. Ferguson*, 115 So. 3d 1204, 1210 (La. Ct. App. 2013).

80. The duty of loyalty "includes the obligation of utmost good faith, fairness, and honesty in their dealings with each other with respect to the matters pertaining to the enterprise." *Patin*, 115 So. 3d at 1210 (quoting *Scheffler v. Adams and Reese*, LLP, 950 So. 2d 641, 648 n.2 (La. 2007)). Indeed, "a fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons and

is bound not to act in antagonism, opposition, or conflict with the interest of the principal to even the slightest extent." *Id.*

81. Chaddock breached the fiduciary duties he owed to Array by engaging in self-dealing.

82. Specifically, Chaddock sought to take advantage of the other position he held as an owner and the president of GOL, which was the exclusive provider of vessel services to Array's operations of the Properties and Array's single largest contractor for these operations.

83. Chaddock abused that position – and, in doing so, breached his fiduciary duties to Array – by causing GOL to charge extraordinarily high rates to Array for unwanted and unnecessary vessel services to the Properties. This would serve to enrich Chaddock by his causing Array to pass these inflated costs onto NRW for payment.

84. By enriching himself, Chaddock put in jeopardy four companies: GOM, NRW, Array and GOL (in which Chaddock's partners were likely unaware of his misconduct during the relevant time period).

85. Array has been injured by Chaddock's breaches of fiduciary duty, including by having saddled Array with millions of dollars of asserted obligations to GOL.

86. As a result, Chaddock should be found personally liable for damages resulting from the breaches of his fiduciary duties to Array.

## **FIFTH CLAIM FOR RELIEF – PLAINTIFFS AGAINST GOL AND CHADDOCK**

### **Violations of Louisiana Unfair Trade Practices Act**

(**LA. STAT. ANN. § 51:1401,** *et seq.*)

87. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 86 above as if specifically set forth herein in their entirety.

88. Upon information and belief, GOL and Chaddock knowingly and willfully engaged in unfair, materially misleading and deceptive acts, practices and methods of competition in trade or commerce that offend public policy and are oppressive, unscrupulous and substantially injurious to Plaintiffs.

89. Those unfair, materially misleading and deceptive acts included violating industry standards by (1) dedicating a substantial fleet of vessels to the Properties that vastly outstripped their needs, (2) providing unneeded vessel services to Properties were shut-in or not otherwise operating, (3) charging vessel services on an active status full time even when the vessels were idle, and (4) demanding payment for millions of dollars in unwanted and unnecessary vessel services.

90. The egregious actions of GOL and Chaddock constitute a pattern of unfair and deceptive trade practices involving fraud, misrepresentation, deception, and/or unethical conduct in violation of LA. STAT. ANN. § 51:1405.

91. Plaintiffs have also sustained actual damages as a result of the unfair and deceptive acts and practices of GOL and Chaddock in an amount to be ascertained at trial.

92. Based upon the misconduct of GOL and Chaddock, this case qualifies for actual damages together with costs and attorneys' fees pursuant to the Louisiana Unfair Trade Practices Act.  *See* LA. STAT. ANN. §§ 51:1405 & 1409.

## SIXTH CLAIM FOR RELIEF – ARRAY AGAINST SELLERS

### Conversion

93. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 92 above as if specifically set forth herein in their entirety.

94. Prior to the close of GOM's acquisition of Array, the Sellers caused Array to issue $300,000 to its attorneys as a retainer for prospective legal services. Those legal services are no longer needed.

95. Upon information and belief, since GOM acquired Array, the Sellers have caused some or all of those funds to be sent to them personally.

96. Those funds rightfully belong to Array.

97. The Sellers have wrongfully taken or used those funds.

98. Array has suffered damages due to the Sellers' conversion of Array's funds.

## JURY DEMAND

Plaintiffs request a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs GOM Operating LLC, Array Petroleum, LLC, and Natural Resources Worldwide LLC pray for relief against Defendants Gulf Offshore Logistics, L.L.C., Ronald E. Chaddock, James M. Zotkiewicz, and John S. Russell as follows:

1. That Defendants be duly cited to appear and answer this Complaint;

2. That, after due proceedings, judgment be entered in favor of Plaintiffs in all respect and against the respective Defendants as to each of the above Claims for Relief;

3. That pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, the Court recognize and declare that:

  (1) GOL is not entitled to payments under the GOL Promissory Note due to the breaches to the parties' contracts;

  (2) GOL is not entitled to payments under the GOL Promissory Note due to the Chaddock's fraudulent conduct;

  (3) GOL is not entitled to payments under the GOL Promissory Note due to the unfair trade practices of GOL and Chaddock;

      (4)      The amount owed under the GOL Promissory Note should be reduced according to the losses incurred by GOM and NRW as a result of (a) the breaches to the parties' contracts, (b) Chaddock's fraudulent conduct, and/or (c) the unfair trade practices of GOL and Chaddock;

      (5)      Chaddock is not entitled to payments under the Chaddock Promissory Note due to the breaches to the parties' contracts;

      (6)      Chaddock is not entitled to payments under the Chaddock Promissory Note due to the Chaddock's fraudulent conduct;

      (7)      Chaddock is not entitled to payments under the Chaddock Promissory Note due to the unfair trade practices of GOL and Chaddock;

      (8)      The amount owed under the Chaddock Promissory Note should be reduced according to the losses incurred by GOM and NRW as a result of (a) the breaches to the parties' contracts, (b) Chaddock's fraudulent conduct, and/or (c) the unfair trade practices of GOL and Chaddock;

      (9)      The GOL Promissory Note acted as a novation of all outstanding invoices issued by GOL to Array;

      (10)      As a result of the novation, GOL is not entitled to any relief based on those invoices and GOL's redress is limited to the terms of the GOL Promissory Note; and

      (11)      Because the MIPA controls the Sellers' available means of relief, as opposed to any work performed in favor of the Properties, the Sellers can only seek relief pursuant to the terms of the MIPA.

4.      That Plaintiffs be awarded damages, reasonable attorneys' fees, and costs, and

5.      That Plaintiffs be granted any and all other relief that the Court may deem just and equitable.

Respectfully submitted,

Dated: February 21, 2025  STONE PIGMAN WALTHER WITTMANN LLC

By: */s/ Paul J. Masinter*

Paul J. Masinter (La. Bar No. 18324)
Andrew D. Mendez (La. Bar No. 26686)
Bryant S. York (T.A.) (La. Bar No. 34165)
Gabriel G. Silva (La. Bar No. 38893)
Edward B. Poitevent, II (La. Bar No. 10564)
909 Poydras Street, Suite 3150
New Orleans, Louisiana 70112
Telephone: (504) 581-3200
Facsimile: (504) 581-3361
Email: pmasinter@stonepigman.com
 amendez@stonepigman.com
 byork@stonepigman.com
 gsilva@stonepigman.com
 epoitevent@stonepigman.com

*Attorneys for Plaintiffs GOM Operating LLC, Array Petroleum, LLC, and Natural Resources Worldwide LLC*